IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

     Plaintiff,

     v.

BOBBY G. PULLEN,

     Defendant.

Case No. 98-40080-01-JAR

## MEMORANDUM AND ORDER

This matter is before the Court on Defendant Bobby G. Pullen's Motion to Reduce

Sentence under 18 U.S.C. § 3582(c)(1)(A)(i) (Doc. 192), as supplemented (Docs. 196, 201, 202).

Defendant moves for compassionate release for two primary reasons: (1) he is a vulnerable

inmate at high risk for contracting a severe case of COVID-19 due to his chronic medical

conditions; and (2) he was sentenced under a mandatory sentencing scheme that, under current

law, would not apply.  Pullen argues that taken together, these reasons constitute an

extraordinary and compelling reason to grant a sentence reduction to time-served.  The

Government opposes Defendant's motion.[1]  For the reasons explained more fully below, the

Court grants Defendant's motion.

I.      **Background and Procedural History**

Following a jury trial in 1999, Pullen was convicted of one count of possession with

intent to distribute approximately 320 pounds of marijuana in violation of 21 U.S.C. § 841(a)(1).

At the time he was convicted and sentenced, all federal courts were required to abide by the

---

[1]Doc. 194.

sentencing ranges set out in the United States Sentencing Guidelines ("U.S.S.G.").  Pullen had previously been convicted in Missouri for escape, and that crime was deemed a crime of violence under the residual clause of U.S.S.G. § 4B1.1.  As a result, Pullen was determined to be a "career offender," and his offense level was 34 with a criminal history category of VI.  Bound by the then-mandatory Guidelines range, the Court sentenced Pullen to a controlling term of 262-months' imprisonment, to be served consecutive to his state revocation sentence, followed by a five-year term of supervised release.[2]  If Pullen had not been deemed a career offender, his Guidelines sentencing range would have been 92–115 months based on a base offense level of 26 and a criminal history category of IV.  But because his escape conviction was considered a crime of violence, his mandatory Guidelines sentencing range was 262–327 months' imprisonment.  The Tenth Circuit affirmed Pullen's conviction and sentence on appeal.[3]

In 2005, the Supreme Court determined that mandating courts to abide by the Guidelines violated the right to trial by jury under the Sixth Amendment.[4]  Thus, the Court converted the mandatory sentencing system into an advisory one.  Pullen filed a motion pursuant to 28 U.S.C. § 2255 in March 2006.  The Court dismissed Pullen's motion as time-barred.[5]  Then, in 2015, the Supreme Court ruled the residual clause of the Armed Career Criminal Act ("ACCA") was unconstitutional because it was void for vagueness.[6]  Both the ACCA's and the Guidelines' residual clauses contained identical language, but the holding of *Johnson* has not been applied to

---

[2]Doc. 95.

[3]*See United States v. Pullen*, 232 F.3d 903 (Table), 2000 WL 1480362 (10th Cir. 2000).

[4]*United States v. Booker*, 543 U.S. 220 (2005).

[5]Doc. 130.

[6]*United States v. Johnson*, 576 U.S. 591 (2015).

the Guidelines' residual clause.[7]  Following the Supreme Court's decision in *Johnson*, the Tenth

Circuit authorized Pullen to file a successive § 2255 motion.[8]

Pullen filed his second § 2255 motion in May 2016, arguing that the residual clause of

U.S.S.G. § 4B1.2 was also void for vagueness since its language mirrored that of the ACCA.

Thus, Pullen concluded, his escape conviction could not qualify as a crime of violence, he was

not a career offender as described in § 4B1.2, and he should be resentenced.  In its response to

that motion, the Government conceded Pullen's escape conviction no longer qualified as a

predicate crime of violence under § 4B1.2;[9] but the Government also argued *Johnson* did not

retroactively apply to the residual clause of the Guidelines.

This Court denied Pullen's motion, holding Pullen's claim was untimely because *Johnson*

did not create a newly-recognized right allowing petitioners to assert vagueness challenges under

the Due Process Clause based on the Guidelines' residual clause.[10]  The Tenth Circuit affirmed,[11]

and in January of this year, the Supreme Court denied Pullen's petition for a writ of certiorari,

over the dissent of two justices.[12]

On April 9, 2020, Pullen sent a request for compassionate release based on the First Step

Act ("FSA") to the warden of FCI Pollock.[13]  The warden denied his request on April 15, 2020.[14]

The Federal Public Defender ("FPD") entered an appearance for Pullen pursuant to Standing

---

[7]*See, e.g.*, *United States v. Beckles*, 137 S. Ct. 886 (2017).

[8]Doc. 155.

[9]Doc. 171 at 3–4.

[10]Doc. 180 at 5.

[11]*United States v. Pullen*, 913 F.3d 1270, 1283–84 (10th Cir. 2019).

[12]Doc. 190; *Pullen v. United States*, 140 S. Ct. 814 (2020).

[13]Doc. 192-1.

[14]Doc. 192-3.

Order 19-1 and he moves for compassionate release Court based on extraordinary and compelling circumstances, including: (1) Pullen's chronic health conditions that render him particularly vulnerable to developing a severe illness if he contracts COVID-19; and (2) Pullen's lengthy sentence, which he would not have received under current law.  According to the medical records that have been produced in the case, Pullen has been diagnosed with Hepatitis C and hypertension as well as a not-yet-diagnosed painful stomach condition.[15]  Pullen requests the Court reduce his term of imprisonment to time served.  The United States Probation Office ("USPO") has verified and approved his release plan to reside with his brother in Tennessee.

Though Pullen has had some disciplinary infractions while incarcerated, the infractions are all relatively minor.  Pullen has also completed skills trainings, participated in educational programs, and maintained good family bonds while incarcerated.  Recently, Pullen was transferred to FCI Pollock based, in part, on his low security risk.  His projected release date is April 26, 2024.

At the time of the motion, the Bureau of Prisons ("BOP") reported zero positive cases of COVID-19 among inmates at FCI Pollock.[16]  As of July 20, 2020, the BOP is now reporting one positive inmate case and three positive cases among staff at FCI Pollock, with an additional seven cases among staff at the associated Pollock USP.[17]  The BOP also reports that only 83 prisoners have been tested, out of the 1,337 prisoners at FCI Pollock.[18]

---

[15]Doc. 198, Attachment 4 (filed under seal).

[16]Federal Bureau of Prisons, *COVID 19 Coronavirus: COVID-19 Cases*, https://www.bop.gov/coronavirus (accessed June 18, 2020).

[17]*Id.* (last accessed July 20, 2020).

[18]Federal Bureau of Prisons, *COVID 19 Coronavirus: Inmate Test Information*, https://www.bop.gov/coronavirus (last accessed June 18, 2020); *see* Federal Bureau of Prisons, FCI Pollock, https://www.bop.gov/locations/institutions/pom (last accessed July 20, 2020).

## II.   Legal Standards

"[I]t is well-settled that '[a] district court is authorized to modify a [d]efendant's sentence only in specified instances where Congress has expressly granted the court jurisdiction to do so.'"[19]  Section 3582(c) permits a court to modify a term of imprisonment for compassionate release only if certain exceptions apply.  Until recently, these exceptions required the BOP to move on a defendant's behalf.  In 2018, however, the FSA modified the compassionate release statute, permitting a defendant to bring his own motion for relief,[20] but only if he "has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on [his] behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier. . . ."[21]  Unless a defendant meets this exhaustion requirement, the court lacks jurisdiction to modify the sentence or grant relief.[22]  A defendant requesting compassionate release bears the burden of establishing that compassionate release is warranted under the statute.[23]

Where a defendant has satisfied the exhaustion requirement, a court may reduce the defendant's sentence, after considering the factors set forth in 18 U.S.C. § 3553(a) to the extent they are applicable, if the court determines: (1) "extraordinary and compelling reasons warrant such a reduction"; or (2) "the defendant is at least 70 years of age, has served at least 30 years in

---

[19]*United States v. White*, 765 F.3d 1240, 1244 (10th Cir. 2014) (quoting *United States v. Blackwell*, 81 F.3d 945, 947 (10th Cir. 1996)).

[20]First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194 (2018).

[21]18 U.S.C. § 3582(c)(1)(A).

[22]*United States v. Johnson*, 766 F. App'x 648, 650 (10th Cir. 2019) (holding that without an express statutory authorization, a court lacks jurisdiction to modify a sentence).

[23]*See United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016) (defendant bears the burden of demonstrating entitlement to relief under § 3582(c)(2)); *United States v. Bright*, No. 14-10098-JTM, 2020 WL 473323, at *1 (D. Kan. Jan. 29, 2020) (noting the "extraordinary and compelling" standard imposes a heavy burden on an inmate seeking compassionate release under § 3582(c)(1)(A)).

prison, pursuant to a sentence imposed under section 3559(c) . . . and a determination has been

made by the Director of the [BOP] that the defendant is not a danger to the safety of any other

person or the community."[24]   In addition, a court must ensure that any reduction in a defendant's

sentence under this statute is "consistent with applicable policy statements issued by the

Sentencing Commission."[25]

 The FSA does not itself define what constitutes "extraordinary and compelling reasons"

to justify a reduction in sentence.  28 U.S.C. § 994(t) provides that "[t]he [Sentencing]

Commission, in promulgating general policy statements regarding the sentencing modification

provisions in section 3582(c)(a)(A) of title 18, shall describe what should be considered

extraordinary and compelling reasons for sentence reduction, including the criterial to be applied

and a list of specific examples."  That policy statement is found at U.S.S.G. § 1B1.13.

 The Sentencing Commission's comments to § 1B1.13 set forth four circumstances under

which extraordinary and compelling reasons may exist: (1) the defendant is suffering from a

terminal illness, i.e., a serious, advanced illness with an end-of-life trajectory; (2) the defendant

is suffering from a serious physical or medical condition, serious functional or cognitive

impairment, or deteriorating physical or mental health because of the aging process that

substantially diminishes the ability of the defendant to provide self-care within the environment

of a correctional facility and from which the defendant is not expected to recover; (3) the

defendant is at least 65 years old, is experiencing a serious deterioration in physical or mental

health because of the aging process, and has served at least ten years or seventy-five percent of

---

[24]18 U.S.C. § 3582(c)(1)(A).

[25]*Id.*; *see also Dillon v. United States*, 560 U.S. 817, 819 (2010) (holding the Sentencing Commission policy statement regarding 18 U.S.C. § 3582(c)(2) remains mandatory in the wake of *United States v. Booker*, 543 U.S. 220 (2005)).

the term of imprisonment, whichever is less; and (4) the defendant needs to serve as a caregiver for a minor child, spouse, or registered partner.[26]

Pullen's age and family circumstances are not applicable here, and he does not argue that he can satisfy any of the qualifying medical conditions.  Instead, he invokes subdivision (D), the so-called "catchall" provision included in § 1B1.13, which provides that extraordinary and compelling reasons "other than, or in combination with," the four listed may be sufficient to warrant relief, as determined by the Director of the BOP.[27]  The BOP has made no such determination in this case.

The Government argues that only the BOP may rely on the catchall provision, and that courts may not make their own determination.  The Court disagrees.  As this Court has previously determined, in accordance with the weight of authority, the Court is not limited to circumstances (A) through (C), and it may exercise its own discretion to determine whether other extraordinary and compelling reasons warrant relief under the statute.[28]  Although the Guideline provides helpful guidance on what constitutes extraordinary and compelling reasons, it is not conclusive given the recent statutory changes.

---

[26]U.S. Sentencing Guidelines Manual § 1B1.13 cmt. n.1 (A) through (C) (U.S. Sentencing Comm'n 2018).

[27]*Id.*

[28]*United States v. Reece*, No. 16-20088-JAR, 2020 WL 3960436, at *3 (D. Kan. July 13, 2020); *United States v. Lavy*, No. 17-20033-JAR, 2020 WL 3218110, at *3 (D. Kan. June 15, 2020); *see also United States v. Younger*, No. 16-40012-02-DDC, 2020 WL 3429490, at *5 (D. Kan. June 23, 2020); *United States v. Jackson*, No. 08-20150-02-JWL, 2020 WL 2812764, at *3 (D. Kan. May 29, 2020); *United States v. Perez*, No. 88-10094-JTM, 2020 WL 1180719, at *2–3 (D. Kan. Mar. 11, 2020); *United States v. O'Bryan*, No. 96-10076-JTM, 2020 WL 869475, at *2 (D. Kan. Feb. 21, 2020); *United States v. Somerville*, No. 2:12-CR-225-NR, 2020 WL 2781585, at *6 (W.D. Pa. May 29, 2020) (quoting *Rodriguez*, 2020 WL 1627331, at *3–4) (collecting cases).

## III.     Discussion

### A.     Exhaustion

Pullen has satisfied the exhaustion requirement as required by § 3582(c).  Pullen filed a request to the warden of FCI Pollock on April 9, 2020, raising all grounds for relief contained in the instant motion.[29]  The warden received that request on April 10, 2020,[30] and subsequently denied Pullen's request on April 15, 2020.[31]  The Government does not dispute that Pullen has satisfied the applicable exhaustion requirement.  The Court therefore has jurisdiction to decide Pullen's motion.[32]

### B.     Extraordinary and Compelling Reasons

Pullen argues that the existing COVID-19 pandemic and his particular vulnerability to contracting a severe illness if infected provide an extraordinary, compelling reason to grant compassionate release.  The Government opposes the motion.  It argues § 3582(c)(1)(A) contemplates relief based on individual circumstances, and that the pandemic itself is not a sufficient ground for general relief for the prison population.  It also cites the general measures that the BOP has taken to address COVID-19 in its facilities, although it does not discuss any measures or conditions specific to Pullen's facility, FCI Pollock.  The Government acknowledges that if an inmate has a chronic medical condition that has been identified by the Centers for Disease Control and Prevention ("CDC") as elevating the inmate's risk of becoming seriously ill from COVID-19, that condition may satisfy the standard of "extraordinary and

---

[29]Doc. 192-1 at 1–4.

[30]Doc. 192-2.

[31]Doc. 192-3.

[32]*See United States v. Boyles*, No. 18-20092-JAR, 2020 WL 1819887, at *2 (D. Kan. Apr. 10, 2020) (holding that if a criminal defendant fails to meet the First Step Act's exhaustion requirement, the Court lacks jurisdiction over the motion).

compelling reasons."[33]   The Government contends, however, that Pullen's underlying medical conditions fall short of establishing the level of severity required under the policy statement.

With respect to motions brought during the current pandemic, "[c]ourts around the country have granted compassionate release where the defendant suffers from a serious condition that increases the likelihood of severe consequences from COVID-19."[34]   The Court is mindful that while "the mere presence of COVID-19 in a particular prison cannot justify compassion release,"[35] "[m]ost, though not all, of the cases where compassionate release has been granted also involv[e] some showing that COVID-19 is actually present, usually to a significant degree, in the facility where the prisoner is incarcerated."[36]   By contrast, courts often deny compassionate release motions "where prisoners articulate only generalized or speculative fear about the risk of infection, without any showing of serious medical vulnerability or uncontrolled exposure risk in the prison where they are held."[37]   The Court concludes in its discretion, for the reasons set forth below, that extraordinary and compelling reasons exist in this case to reduce Pullen's sentence to effect his release from prison, given the elevated risk of harm from the virus

---

[33]*See, e.g., United States v. Martin*, No. DKC 04-0235-5, 2020 WL 3447760, at *2 (D. Md. June 24, 2020); *see also* U.S. Sentencing Guidelines Manual § 1B1.13 cmt. n.1 (A)(ii)(I) (U.S. Sentencing Comm'n 2018).

[34]*Somerville*, 2020 WL 2781585, at *7 (collecting cases).

[35]*United States v. Seymon*, No. 11-10040, 2020 WL 2468762, at *4 (C.D. Ill. May 13, 2020).

[36]*Somerville*, 2020 WL 2781585, at *7; *see also United States v. Gorai*, No. 2:18-CR-220 JCM, 2020 WL 1975372, at *2 (D. Nev. Apr. 24, 2020) ("To make matters worse, defendant notes that '[o]n April 16, 2020, the count at Lompoc USP, now leading the BOP in inflicted inmates and staff, had 69 inmates and 22 staff testing positive.'  Even those numbers may be underrepresentative because only inmates with symptoms are tested."); *United States v. Cassidy*, No. 17-CR-116S, 2020 WL 2465078, at *7 (W.D.N.Y. May 13, 2020) ("Here, however, [the defendant] demonstrates more than just a general possibility that he could contract COVID-19. [ . . . ]  He demonstrates incarceration in a proven 'hotbed' facility that has numerous positive cases, including inmates with whom [the defendant] has shared quarters.").

[37]*Somerville*, 2020 WL 2781585, at *8 (citing *United States v. Canada*, No. 119-014, 2020 WL 2449344, at *1 (S.D. Ga. May 12, 2020); *United States v. Brooks*, No. 07-cr-20047-JES-DGB, 2020 WL 2509107, at *5 (C.D. Ill. May 15, 2020); *United States v. Gagne*, ---F. Supp. 3d.---, 2020 WL 1640152, at *5 (D. Conn. Apr. 2, 2020)).

created by his medical conditions, the outbreak and conditions at FCI Pollock, and his rehabilitative efforts.

### 1. Underlying Health Risks

Pullen cites multiple chronic medical conditions as creating a heightened risk for severe complications from COVID-19, including hypertension, hepatitis C, hypothyroidism, stomach issues, depression, and anxiety.  Pullen has supplemented the record with documents indicating his medical conditions may put him at risk, including medical records showing diagnosis and treatment history.[38]  Pullen also addresses the June 25, 2020 changes in CDC guidance that updates the list of underlying conditions for serious complications with COVID-19.

Pullen was first diagnosed with hypertension in the 1990s and takes two prescription medications as part of his continuing treatment.  In its most recent guidance, the CDC added hypertension to its list of conditions that may increase an individual's risk of severe illness from COVID-19.[39]  Additionally, in multiple studies of patients with COVID-19, most patients who died had at least one comorbidity.  Among the comorbidities, hypertension appeared frequently, indicating a strong relationship between hypertension and a patient's likelihood of developing a severe illness from COVID-19.[40]  This Court has previously recognized that the CDC has

---

[38]Doc. 198.

[39]CDC, *Coronavirus Disease 2019 (COVID-19): People of Any Age with Underlying Medical Conditions*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html#liver-disease (last accessed July 17, 2020).

[40]JAMA Internal Medicine, *Risk Factors Associated with Acute Respiratory Distress Syndrome and Death in Patients with Coronavirus Disease 2019 Pnuemonia in Wuhan, China*, https://jamanetwork.com/journals/jamaint ernalmedicine/fullarticle/2763184 (Mar. 13, 2020) (in a study of 201 infected patients, 84 developed acute respiratory distress syndrome (ARDS), and of those 84 with ARDS, 23 had hypertension compared to just 16 of 117 with hypertension who did not develop ARDS); The Lancet, *Are Patients with Hypertension and Diabetes Mullitus at Increased Risk for COVID-19 Infection?*, https://www.thelancet.com/journals/lanres/article/PIIS2213-2600(20)30116-8/fulltex (Mar. 11, 2020) (concluding that the most frequent comorbidities of patients with COVID-19 were diabetes, hypertension, and cerebrovascular disease).

identified hypertension as a comorbidity that increases the likelihood of serious risk from COVID-19, and has granted compassionate release in part on that basis.[41]

Pullen is a forty-nine-year-old male and has not yet reached an age that is particularly susceptible to an increased risk of COVID-19 complications.  Data gathered by the CDC shows that individuals between 50 and 64 years old are hospitalized at a much higher rate than that of younger adults, and that eight out of ten COVID-19 deaths in the United States have been in adults 65 years old and older.[42]  Pullen does not provide sufficient information to determine whether his age, hypothyroidism, stomach issues, depression, or anxiety make him particularly vulnerable, and the Court does not make a determination about the impact of these conditions.

The medical records submitted in this case indicate that Pullen also suffers from chronic, untreated hepatitis C, which was first diagnosed in 2005 or 2006.[43]  Pullen's medical history reflects that he had a liver biopsy in 2011, at which time he received test results indicating moderate inflammation of the liver.  He was scheduled to receive HCV "triple therapy" antiviral drug treatment in 2013, but records show the "region" disapproved the treatment after the facility scheduled it.  BOP medical staff also recommended in 2013 that Pullen receive another liver biopsy in two to five years to monitor the progression of the disease, but recent records indicate a follow up biopsy never occurred.  Since then, it appears that Pullen has not received BOP treatment because criteria for treatment is based on a formula and he does not qualify.  But the American Association for the Study of Liver Diseases has removed the prioritization tables for

---

[41]*United States v. Lavy*, No. 17-20033-JAR, 2020 WL 3218110, at *3 (D. Kan. June 15, 2020) (granting compassionate release to defendant who suffered from hypertension, old age, and bipolar disorder); s*ee United States v. Scparta*, No. 18-CR-578 (AJN), 2020 WL 1910481, at *9 (S.D.N.Y. Apr. 20, 2020).

[42]CDC, *COVIDView*, https://www.cdc.gov/coronavirus/2019-ncov/covid-data/covidview/index.html (last accessed July 20, 2020).

[43]Doc. 201, Attachment 4 (filed under seal).

treating patients and now recommends treating all patients with hepatitis C, except those with a short life expectancy, because antiviral treatment reduces mortality rates.[44]  And the best way to determine the amount of scarring of the liver is a biopsy.[45]  Most recently, in March 2020, a BOP physician recommended no treatment for Pullen's hepatitis C, but appears to have mistakenly noted that he had previously been treated.  It does not appear that any bloodwork or biopsy was done at that time to evaluate whether Pullen would qualify for BOP treatment.

The CDC has added liver disease, "especially cirrhosis (scarring of the liver)"[46] to the list of conditions that may place people of any age at an increased risk of severe illness from COVID-19 if the disease is not well-controlled.[47]  Because Pullen has suffered years of chronic hepatitis C, including resulting liver inflammation, without treatment or follow up procedures, it does not appear that his liver condition is "well-controlled."  In addition, recent studies show that hepatitis C also weakens a person's immune system, and accordingly, courts have "granted release to defendants suffering from hepatitis C, among other conditions."[48]

Thus, Pullen credibly claims two conditions—hypertension and a liver damaged from long-term, untreated hepatitis C—that the CDC has linked to COVID-19 complications.

---

[44]American Association for the Study of Liver Diseases, HCV Guidance: Recommendations for Testing, Managing, and Treating Hepatitis C, https://www.hcvguidelines.org/evaluate/when-whom (last accessed July 20, 2020).

[45]Lorren Sandt, Understanding Hepatitis C Disease, ch. 4, p. 30, *available at* https://hepcchallenge.org.wp-content/uploads/2017/09/Chapter_04-Sec_01.pdf (last accessed July 20, 2020).

[46]CDC, People of Any Age with Underlying Medical Conditions, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last accessed July 20, 2020).

[47]CDC, What to Know About Liver Disease and COVID-10, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/liver-disease.html (last accessed July 20, 2020).

[48]*United States v. White*, No. 2:17-cr-00198-4, 2020 WL 3244122, at *4 (S.D. W. Va. June 12, 2020) (quoting *United States v. Stephenson*, ---F. Supp. 3d---, 2020 WL 2566760, at *5 (S.D. Iowa May 21, 2020)); *Miller v. United States*, No. CR 16-20222-1, 2020 WL 1814084, at *1 (E.D. Mich. Apr. 9, 2020).

Collectively, these underlying conditions are enough to satisfy the Court that Pullen faces a

heightened risk of serious illness or death if infected with the virus.

### 2.   Current Placement at FCI Pollock

As noted, the BOP recently reported one inmate and three staff cases of COVID-19 at

FCI Pollock.[49]  But as Pullen points out, and other courts have noted, a lack of reported cases

could easily signify a lack of testing in a given facility, particularly where, as here, the

Government provides no information about the current testing protocols at the facility and fewer

than 10% of the inmate population has reportedly been tested.[50]  And in many facilities, the

BOP's prevention and containment measures have failed to prevent the spread of COVID-19.[51]

While the Court recognizes the BOP's efforts to mitigate the effects of COVID-19, the ease of

transmission within the prison environment combined with a lack of testing will likely result in

deadly outbreaks of the disease.  Other courts have granted compassionate release to inmates

who, like Pullen, had health problems that made them particularly vulnerable to a serious illness

if they contracted COVID-19, even where the defendant was housed in a facility with no

reported cases.[52]

Similar considerations support Pullen's request for compassionate release.  Pullen argues

the conditions at FCI Pollock makes it impossible for inmates to engage in social distancing as

---

[49]Federal Bureau of Prisons, *COVID 19 Coronavirus: COVID-19 Cases*, https://www.bop.gov/coronavirus (last accessed July 20, 2020).

[50]*See, e.g.*, *United States v. Asaro*, No. 17-cr-127 (ARR), 2020 WL 1899221, at *3 (E.D.N.Y. Apr. 17, 2020) (reasoning that without "more information about how much testing the BOP is conducting, it is possible that undetected cases are present in the facility"); *see also Matter of Extradition of Toledo Manrique*, No. 19-MJ-71-55-MAG-1 (TSH), 2020 WL 1307109 (N.D. Cal. Mar. 19, 2020).

[51]*See* Michael Balsamo & Michael R. Sisak, *Federal Prisons Struggle to Combat Growing COVID-19 Fears*, Associated Press (Mar. 27, 2020), https://apnews.com/724ee94ac5ba37b4df33c417f2bf78a2.

[52]*See United States v. Peters*, No. 3:18-CR-188 (VAB), 2020 WL 2092617, at *4 (D. Conn. May 1, 2020); *United States v. Echevarria*, No. 3:17-CR-44 (MPS), 2020 WL 2113604, at *2 (D. Conn. May 4, 2020); *United States v. Atkinson*, No. 2:19-CR-55 JCM (CWH), 2020 WL 1904585, at *2–4 (D. Nev. Apr. 17, 2020).

recommended by the CDC.[53]  In response, the Government does not appear to contest Pullen's inability to protect himself from the spread of COVID-19, instead reiterating that the BOP has a pandemic plan in place.  Though commendable, the Court recognizes the reality that, notwithstanding the measures BOP has taken, many facilities have experienced outbreaks.  Three confirmed cases among FCI Pollock staff and one inmate demonstrates that the measures to protect inmates may have already failed.  The circumstances in FCI Pollock are self-evidently hazardous.[54]  The combination of Pullen's health conditions and his incarceration compounds the risk COVID-19 poses to him.  If the Court were to wait to act until the BOP confirmed the spread of cases at FCI Pollock, it may be too late for vulnerable inmates such as Pullen.[55] Accordingly, the low number of confirmed inmate COVID-19 cases at FCI Pollock does not defeat Pullen's ability to seek compassionate release based on the risk he may experience severe illness if exposed to COVID-19.

Finally, Pullen has proposed a release plan to live with his brother in Tennessee, which has been verified and approved by the USPO.  Although the Government argues that the Court should weigh a defendant's risk while incarcerated against the likelihood of harm from COVID-19 if released, it has not criticized Pullen's release plan nor addressed the conditions at FCI Pollock.  As discussed above, the virus has breached the prison and testing to date has been minimal.  It is clear to the Court that the risk for Pullen is greater on the inside of prison than outside; and, his release plan is both reasonable and represents the best solution available to the

---

[53]*United States v. Davis*, No. ELH-20-09, 2020 WL 1529158, at *4 (D. Md. Mar. 30, 2020) ("The inability to practice social distancing in jails makes transmission of COVID-19 more likely.").

[54]*See Basank v. Decker*, No. 20 Civ. 2518 (AT), 2020 WL 1481503, at *5 (S.D.N.Y. Mar. 26, 2020) ("The risk of contracting COVID-19 in tightly-confined spaces, especially jails, is now exceedingly obvious.").

[55]*United States v. Pabon*, No. 17-165-1, 2020 WL 2112265 (E.D. Pa. May 4, 2020).

Court to safeguard his health.  The situation at FCI Pollock combined with Pullen's underlying medical conditions provides an extraordinary and compelling reason for relief in this case.

### 3.   Rehabilitation

Rehabilitation is also relevant to whether a sentence reduction is warranted.  Both Congress and the Sentencing Commission have indicated rehabilitation, while not by itself and extraordinary and compelling reason, may be considered with other factors.[56]  This means that courts can consider rehabilitation as part of a compassionate release motion.[57]  Pullen has accepted responsibility for his offense and has done quite well during more than twenty-two years of incarceration.  He has successfully completed programs for drug abuse, Microsoft Office, typing, Spanish, real estate, business education, investing, and various programs relating to making life changes and making better decisions.[58]  His transfer to a lower security institution in January 2020 is a further indication of good behavior.  Pullen has maintained good family ties and plans to reside with his brother if his motion is granted.  He has job skills he will be able to use upon release, including welding, landscaping, iron work, concrete, and construction.[59]  Thus, Pullen's rehabilitation cuts in favor of release.

### 4.   Sentencing Disparity

Pullen also moves for compassionate release based on subsequent changes to federal sentencing laws and guidelines.  Pullen relies on changes in the law articulated in *Booker* and *Johnson*, alongside changes rendering his escape conviction no longer a predicate offense for

---

[56]*See* U.S. Sentencing Guidelines Manual § 1B1.13 cmt. n.3 (U.S. Sentencing Comm'n 2018); 28 U.S.C. § 994(t).

[57]*See, e.g., United States v. Perez*, No. 88-10094-JTM, 2020 WL 1180719, at *3 (D. Kan. Mar. 11, 2020); *United States v. Stephenson*, ---F. Supp. 3d---, 2020 WL 2566760, at *7 (S.D. Iowa May 21, 2020) (citing cases).

[58]Doc. 192-1 at 4.

[59]*Id.*

career-offender status.  The Government argues that, even if the Court may consider other reasons under the catchall provision under § 1B1.13, non-retroactive, post-sentencing developments in the interpretation of unchanged Guidelines text do not constitute extraordinary and compelling reasons for sentencing modification under § 3582(c)(1)(A).

Pullen is correct that some courts have considered a change in sentencing law in granting relief under § 3582(c)(1)(A).  He cites to multiple cases where courts have determined § 3582(c)(1)(A), as amended by the First Step Act, permits sentence reductions for "stacked" convictions under 18 U.S.C. § 924(c).[60]  The Court is not convinced that the reasoning of these "stacking" provision cases extends to the sentencing disparity issue before it.  Having determined that Pullen's diagnosed medical conditions, risk of infection, and rehabilitation constitute extraordinary and compelling reasons for compassionate release, the Court does not reach this issue.  As discussed below, however, Pullen's sentencing disparity is clearly relevant to the Court's consideration of the factors set forth in 18 U.S.C. § 3553(a).

### C.   Danger to the Community

The policy statement in Guideline § 1B1.13 requires that a defendant not be a danger to the safety of another person in the community, and the Court finds that this requirement is satisfied in this case.  The Government does not argue that Pullen's release presents any danger.  Pullen is currently in a low-security facility.  His offense was marijuana distribution, which is not a crime of violence.  Pullen was incarcerated at age twenty-seven and will soon be fifty years old.  His only violent offense, conspiracy to commit murder, occurred when he was seventeen years old and was related to a history of family abuse.[61]

---

[60]*See* Doc. 193 at 16–18 (collecting cases).

[61]PSIR ¶¶ 30-36.

### D.     Section 3553(a) Factors

Finally, the Court must "consider the factors set forth in section 3553(a) to the extent they are applicable" to determine the sentence that would be appropriate.[62]  Those factors are: (1) the nature of the offense and the defendant's personal history and characteristics; (2) his sentence relative to the nature and seriousness of his offenses; (3) the need for a sentence to provide just punishment, promote respect for the law, reflect the seriousness of the offense, deter crime, and protect the public; (4) the need for rehabilitative services; (5) the applicable Guideline sentence; and (6) the need to avoid unwarranted sentence disparities among similarly-situated defendants.[63]

These factors support the reduction of Pullen's sentence.  To be sure, the "nature and circumstances of the offense" are serious—Pullen was convicted of possession with intent to distribute significant amount of marijuana.  While this was not Pullen's first offense, his only violent offense occurred when he was a juvenile.  Pullen has accepted responsibility for his offense and his exemplary rehabilitative progress in prison, discussed above, suggests he is a different person today.

Further, the "need for the sentence imposed" appears weak after over fifteen years of incarceration.  Without question, Pullen's career-offender status influenced the length of his sentence.  Pullen was convicted and sentenced in 1999 when the Guidelines were binding on courts.  Since then, the laws under which Pullen received his mandatory 262-month sentence have changed.  Under the Guidelines' residual clause, Pullen was deemed a career offender based on his prior Missouri conviction of "escape," which was categorized as a crime of violence.  As a result, Pullen's then-mandatory Guidelines sentencing range was 262–327

---

[62] 18 U.S.C. § 3582(c)(1)(A).

[63] *See* 18 U.S.C. § 3553(a)(1)-(6).

months.  While seeking post-conviction relief, the Government has conceded that Pullen's escape conviction no longer qualifies as a crime of violence.  Notwithstanding this concession, Pullen has not successfully petitioned for resentencing.  If sentenced today, Pullen would not qualify as a career offender and his Guideline range would be 92–115 months.

Pullen has already served fifteen years on his federal sentence, with twenty-two years of continuous incarceration.  His incarceration for a period of approximately 180 months is sufficient to serve the goals of incapacitation, deterrence, retribution, and rehabilitation.  Significantly, Pullen has already served a sentence that far exceeds the top end of the Guidelines that would have applied here, and there is nothing about this case that suggests an above-Guidelines sentence is warranted.  The Court finds that the § 3553(a) factors weigh in favor of reducing Pullen's sentence to time served, to be followed by a five-year term of supervised release.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendant Bobby G. Pullen's Motion for Compassionate Release Pursuant to 18 U.S.C. § 3582(c)(1)(A) (Doc. 192) is **GRANTED**.  Pullen's term of imprisonment is reduced to time served.

**IT IS FURTHER ORDERED** that Pullen's five-year term of supervised release shall begin immediately upon his release.  All previously-imposed terms and conditions of Pullen's supervised release remain in effect.  Pullen shall remain in self-quarantine for **fourteen (14)** days upon returning home and shall comply with national, state, and local orders regarding COVID-19.

**IT IS SO ORDERED.**

Dated: July 20, 2020

S/ Julie A. Robinson
JULIE A. ROBINSON
CHIEF UNITED STATES DISTRICT JUDGE